UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| TERRI L. EARLS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 4:05-cv-92-WGH-DFH |
| | ) | |
| BELTERRA RESORT, INDIANA, LLC | ) | |
| d/b/a BELTERRA RESORT | ) | |
| AND CASINO, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM DECISION**

**I.   Introduction**

This matter is before the Honorable William G. Hussmann, Jr., United States Magistrate Judge, on Defendant's Motion for Summary Judgment filed March 8, 2006.  (Docket Nos. 24-25).[1]  Plaintiff filed his Brief in Opposition on May 25, 2006.  (Docket No. 29).  Defendant filed its Reply Brief on June 30, 2006.  (Docket No. 32).

**II.   Procedural Background**

Plaintiff claims that she sustained injuries while employed on a casino boat located on a navigable waterway, and that these injuries were a result of defendant's negligence.  (Amended Complaint, ¶¶ 2, 5).  Hence, plaintiff filed her action under the Jones Act, 46 U.S.C. § 688.  Defendant filed a Motion for Summary Judgment

---

[1] The parties consented to Magistrate Judge jurisdiction in this case in their Case Management Plan filed October 10, 2005.  (Docket No. 17).  District Judge David F. Hamilton entered an Order of Reference on October 12, 2005.  (Docket No. 18).

alleging that the Jones Act does not apply to defendant. (Defendant's Brief in Support of Motion for Summary Judgment at 2). For the reasons outlined below, the Magistrate Judge concludes that defendant is entitled to summary judgment in this instance.[2]

### III.   Facts

The following facts are taken from the deposition of Gianni Boccuzzi ("Boccuzzi Dep.") and the Affidavit of Mary Johnson ("Johnson Aff."), the Risk Manager for the defendant. Although the inferences to be drawn from these facts are disputed, the facts themselves are undisputed and the plaintiff's Brief in Opposition to the Motion for Summary Judgment does not indicate that there are any other disputed facts material to the resolution of this motion.

   1.   The motor vessel, "Miss Belterra," was constructed as a vessel, has a raked bow (Boccuzzi Dep., p. 40), is 370 feet long and 105 feet wide, and was certified by the Coast Guard for service as a passenger vessel operating on inland waterways (Boccuzzi Dep., pp. 15-16).

   2.   The "Miss Belterra" cruised the Ohio River until August 1, 2002, when it went dockside. (Boccuzzi Dep., pp. 8-9).

   3.   The Indiana General Assembly authorized dockside gambling through legislation enacted effective July 1, 2002. IND. CODE § 4-33-6-21.

---

[2]As a person who grew up in the middle of Indiana cornfields and whose only personal experiences with the "perils of the sea" are limited to being on a very few one-half day snorkeling or fishing trips off the coast of Florida, it is with some trepidation that I place this opinion in the public domain.

4.  Plaintiff, Terri L. Earls, was an employee of defendant, Belterra Resort and Casino.  (Amended Complaint, ¶ 3).

5.  On February 4, 2005, plaintiff allegedly sustained injuries to her hip and back while attempting to control a large BVA cart.  (*Id.* ¶¶ 5-6).  Plaintiff alleges that the cart was unwieldy and unseaworthy which contributed to plaintiff's injuries by causing her to twist and wrench her body.  (*Id.* ¶ 6).

6.  On February 4, 2005, the BVA cart was located upon the "Miss Belterra" which itself was located on the Ohio River, a navigable waterway.  (Boccuzzi Dep., pp. 8-9).

7.  On February 4, 2005, the "Miss Belterra" had:

(a)  a full-time crew consisting of a Captain, a first mate, six deck hands, a chief engineer, and an interim technician (Boccuzzi Dep., pp. 10, 13);

(b)  steering controls; a compass; two rescue boats; 3,134 life preservers; three main Cummins diesel engines that drive the propellers; four ships' generators; two outer thrust units which can be used for propulsion and steering as well; 12 ring buoys; one diesel emergency generator; two fire pumps and two bilge pumps; a bilge alarm, radar, a VHF radio; a fathometer and fire screen doors, fire extinguishers, emergency bell and whistle, and navigational lights (Boccuzzi Dep., pp. 27-41); and

(c)  a valid Certificate of Inspection from the Coast Guard (Boccuzzi Dep., p. 16).

8.  On February 4, 2005, the United States Coast Guard had authority over the vessel with an unlimited right to board and inspect and had performed semi-annual propulsion tests on the engines and steering mechanisms.  (Boccuzzi Dep., pp.

18-19). However, the "Miss Belterra" has not been moved from the shore during these engine tests. (Johnson Aff., ¶ 8).

      9. When the vessel "Miss Belterra" became dockside, the Coast Guard allowed certain modifications to the vessel, including:

    (a)    waiver of requirement to maintain a tugboat (the "Phoebe Mercer") that was a requisite of navigation of the "Miss Belterra" vessel;

    (b)    allowance of reduction in crew including omission of one licensed mate and one assistant engineer; and

    (c)    allowance of reduction of inflatable buoyant apparatuses.

(Johnson Aff., ¶ 10).

      10. Since August 1, 2002, the "Miss Belterra" has been moored to shore in essentially the same manner as it was when the vessel cruised. (Boccuzzi Dep., p. 21).

      11. The "Miss Belterra" is now indefinitely moored by way of lines tied to steel pilings, and it receives utilities such as water, sewer, electricity, cable television, telephone, and data processing through land-based sources. (Johnson Aff., ¶¶ 4-5).

      12. The "Miss Belterra" is not in the business of transporting passengers, cargo or equipment. (Johnson Aff., ¶ 11).

      13. The owner of the "Miss Belterra" does not intend to move it from its docked position at any time in the foreseeable future. Additionally, the owner of the "Miss Belterra" does not now intend it to be used in connection with the navigation of seas or other waterways; it is intended to be used solely as an indefinitely moored floating

casino. Its operations are solely related to gaming and are not otherwise maritime in nature. (Johnson Aff., ¶¶ 6-7).

14. However, the vessel could be unmoored and cruising on the Ohio River within five minutes in an emergency situation and within 45 minutes to an hour for a normal cruise. (Boccuzzi Dep., pp. 22-23). The vessel has never been decommissioned by the Coast Guard, nor has it ever applied for permanent mooring status. (Boccuzzi Dep., pp. 26-27). If the vessel were to be permanently moored, it would have to apply for elimination of the Certificate of Inspection issued by the Coast Guard. (Boccuzzi Dep., p. 55).

15. In addition, no part of the casino building or hotel is attached to the vessel. (Boccuzzi Dep., pp. 44).

**IV.   Issues**

The issue before this court is whether the plaintiff can be said to be a seaman entitled to the remedies provided by the Jones Act, 46 U.S.C. § 688.

**V.   Legal Standard**

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). The motion should be granted so long as no rational fact finder could return a verdict in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Thus, a court's ruling on a motion for summary judgment is akin to that of a directed verdict, as the

question essentially for the court in both is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. When ruling on the motion, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences therefrom in that party's favor. *Id.* at 255. If the nonmoving party bears the burden of proof on an issue at trial, that party "must set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e); *see also Silk v. City of Chicago,* 194 F.3d 788, 798 (7th Cir. 1999). Lastly, the moving party need not positively disprove the nonmovant's case; rather, it may prevail by establishing the lack of evidentiary support for that case. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

**VI.   Analysis**

The Jones Act was enacted by Congress in 1920 to provide any "seaman" who is injured in the course of their employment with a federal negligence claim. 46 U.S.C. § 688(a). The Supreme Court has indicated that the intent of Congress, in enacting the Jones Act, was to provide seamen with heightened legal protection in recognition of their exposure to the "perils of the sea." *Chandris, Inc. v. Latsis,* 515 U.S. 347, 368, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995). In the absence of a legislative definition of "seaman," the courts have been left to define that term. The Supreme Court has determined that two criteria must be met for an individual to qualify as a seaman. First, the employee's duties must either contribute to the function of the vessel or to the accomplishment of its mission. Second, "a maritime employee must have a substantial employment-related connection to a vessel in

navigation." *Id.* at 373. In this instance, there is no dispute that plaintiff met the first of the two criteria, as plaintiff certainly contributed to the accomplishment of the riverboat's mission: gambling. Thus, the only question is whether plaintiff's relationship with the "Miss Belterra" amounted to connection to a *vessel in navigation*.

The issue of whether a casino boat is a "vessel in navigation" has been addressed in several cases recently as cited in plaintiff's brief. These cases are, however, from other circuits or states. In the Seventh Circuit, the plaintiff agrees that *Howard v. Southern Illinois Riverboat Casino Cruises, Inc.,* 364 F.3d 854 (7th Cir. 2004), holds that an indefinitely moored casino is not a "vessel in navigation" in these words:

> The only question before us today is whether an indefinitely moored vessel that has the ready capability of cruising, but that is not used or intended to be used for the purpose of moving or transporting, qualifies as a vessel in navigation. To be precise, it is clear that *Players II* is a vessel; what is contested is whether that vessel is in navigation. We are aware that the Supreme Court has granted *certiorari* in *Stewart v. Dutra Construction Co.,* 540 U.S. 1177, 124 S.Ct. 1414, 158 L.Ed.2d 76, 2004 WL 323176 (U.S. Feb. 23, 2004), which presents the question whether a special-purpose dredge is a Jones Act "vessel." See *Pet. for Writ. of Cert.,* 2003 WL 22926387 (U.S. Dec. 3, 2003) (No. 03-814). That question, however, is distinct from the question whether a conventional sea-faring craft is "in navigation," as opposed to "out of navigation" or "withdrawn from navigation." *Chandris,* 515 U.S. at 373-74, 115 S.Ct. 2172. Because the latter question is the one presented in this case, we see no need to postpone our decision for the resolution of *Stewart.* The navigation issue, the Court held in *Chandris,* is normally one of fact reserved for the jury. *Id.* at 373, 115 S.Ct. 2172. As is generally true, however, it is appropriate to remove that issue from the jury if there is no genuine issue of material fact and the law will reasonably support only one conclusion. *Id.*

*Id.* at 856-57. The facts in this case show that, like the "Player II," the "Miss Belterra" is a vessel capable of cruising but it is not intended to be used to transport persons

or cargo. It had not moved in over two and one-half years at the time of plaintiff's injury, and it has not moved since. Since the facts are the same as those in *Howard,* the language binds this court, and the Defendant's Motion for Summary Judgment must be granted unless *Howard* has been expressly or impliedly overruled by another case.

    Plaintiff suggests that the case which overrules *Howard* is the Supreme Court's decision in *Stewart v. Dutra Const. Co.,* 543 U.S. 481, 125 S.Ct. 1118, 160 L.Ed.2d 932 (2005). The Supreme Court in *Stewart* granted *certiorari* to resolve confusion over how to determine whether a watercraft is a "vessel" for purposes of the Longshoreman and Harbor Worker's Compensation Act ("LHWCA"). *Id.* at 486. The case holding does not specifically address a claim brought under the Jones Act.[3] Therefore, it is possible that the Supreme Court's discussion of a "vessel" in *Stewart* applies only to the LHWCA and not the Jones Act. However, the court stated that the Jones Act and LHWCA are "complementary regimes that work in tandem." *Id.* at 488. From this discussion, the court concludes that the *Stewart* decision is something more than mere *dicta* when it discusses principles of general maritime law.

---

[3]The plaintiff in *Stewart* originally asserted a claim under the Jones Act. *Id.* at 485. That claim was dismissed on summary judgment at the trial court level. After affirmance of that decision by the Circuit Court, the case was remanded to the trial court. The trial court granted summary judgment on Stewart's "alternative claim" that Dutra was liable as an owner of a vessel under the LHWCA. *Id.* at 486. The Supreme Court opinion states that the grant of *certiorari* was for purposes of determining whether a watercraft is a vessel for purposes of the LHWCA. The court did not specifically state it was addressing legal concepts applicable to Jones Act claims. From the opinion itself, this Magistrate Judge believes that the Supreme Court intended to direct the opinion only at claims brought by Stewart under the LHWCA, and not also toward any claim previously brought under the Jones Act. Nevertheless, because the two statutory regimes work in tandem, principles of general maritime law clarified in the opinion are likely something more than mere *dicta* as to general maritime law concepts.

This court's reading of *Stewart* does not lead to a conclusion that the case has expressly or by implication overruled *Howard*. *Stewart* discusses whether a "dredge" is a "*vessel*." The *Stewart* court concluded that the dredge was a vessel for purposes of the Longshoreman and Harbor Worker's Compensation Act. Using the definition found in 1 U.S.C. § 3, and applying *Stewart* to this case, this Magistrate Judge would conclude that the "Miss Belterra" is a "vessel" – that is, it is a "watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment." *Id.* at 497.

However, as the *Stewart* court points out, structures may lose their character as vessels if they have been withdrawn from the water for an extended period of time. *Roper v. U.S.,* 368 U.S. 20, 21, 82 S.Ct. 5, 7 L.Ed.2d 1 (1961). Citing to the very appropriate case of *Evansville & Bowling Green Packet Co. v. Chero Cola Bottling Co.,* 271 U.S. 19, 46 S.Ct. 379, 70 L.Ed. 805 (1926),[4] the *Stewart* case holds, in pertinent parts:

> ("[T]he definition of 'vessel in navigation' under the Jones Act is not as expansive as the general definition of 'vessel' " (citations omitted)). Instead, the "in navigation" requirement is an element of the vessel status of a watercraft. It is relevant to whether the craft is "used, or capable of being used" for maritime transportation. A ship long lodged in a drydock or shipyard can again be put to sea, no less than one permanently moored to shore or the ocean floor can be cut loose and

---

[4] The more things change, the more they stay the same. This opinion was written 80 years ago when William Howard Taft was Chief Justice and Oliver Wendell Holmes, Louis Brandeis, and others were Associate Justices. Famous Evansville names of Joseph Iglehart and Isidor Kahn, among others, were "on the brief." The court found that a "wharfboat" towed away in the winter to avoid ice damage, but otherwise secured to the Evansville shore by cables and utilities, was found not to be a "vessel" for certain types of maritime recoveries to damaged property. That vessel must have been moored not more than a few hundred yards from a current casino boat in Evansville. This current District Court, like that one in 1926, hopes to be affirmed by the Supreme Court.

> made to sail. The question remains in all cases whether the watercraft's use "as a means of transportation on water" is a practical possibility or merely a theoretical one. *Supra,* at 1126-1127. In some cases that inquiry may involve factual issues for the jury, *Chandris, supra,* at 373, 115 S.Ct. 2172, but here no relevant facts were in dispute.

*Id.* at 496.

> Simply put, a watercraft is not "capable of being used" for maritime transport in any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement. This distinction is sensible: A ship and its crew do not move in and out of Jones Act coverage depending on whether the ship is at anchor, docked for loading or unloading, or berthed for minor repairs, in the same way that ships taken permanently out of the water as a practical matter do not remain vessels merely because of the remote possibility that they may one day sail again. See *Pavone v. Mississippi Riverboat Amusement Corp.,* 52 F.3d 560, 570 (C.A.5 1995) (floating casino was no longer a vessel where it "was moored to the shore in a semi-permanent or indefinite manner");. . . .

*Id.* at 494.

In this case there are no disputed facts and therefore it is appropriate for the court to decide this case as a matter of law. While it is theoretically possible for the "Miss Belterra" to sail again, the boat had not left the dock for two and one-half years before plaintiff's injury and – now – has not left the dock for four years. It is also instructive that the *Stewart* case mentions a casino riverboat moored to the shore in a semi-permanent or indefinite manner as an example of a structure that is no longer a vessel in navigation.[5] The Magistrate Judge concludes that under the facts of this case, it is only a "remote possibility" that the "Miss Belterra" will sail again.

---

[5]The facts in that case, *Pavone v. Mississippi Riverboat Amusement Corp.,* 52 F.3d 560 (5th Cir. 1995), are not especially close to this case. However, the barge in that case was "indefinitely moored," which is in some ways parallel to the facts of this case.

In this case, like in *Stewart,* no material facts are in dispute. The "Miss Belterra," though theoretically capable of being in navigation, was intended to be taken out of navigation by its owner, and was made practically unable to navigate except in emergency situations at the time of the plaintiff's injuries. There is only a remote possibility it will sail again. The "Miss Belterra" was not a vessel in navigation at the time of the plaintiff's injuries. Though vessels withdrawn from navigation can again be returned to navigation (and in the future the Jones Act could apply if the defendant decides to offer gambling "cruises" on the Ohio), the boat's status at the time of plaintiff's injury did not expose it's employees to the perils of the sea.

## VII.   Conclusion

In this case, the "Miss Belterra" had been indefinitely moored for nearly two and one-half years when plaintiff was injured. And, while it is theoretically possible for the "Miss Belterra" to begin traveling on the Ohio River at some point in the future, such a possibility is, like that in *Howard,* merely theoretical or remote. Such a theoretical or remote possibility does not render the Jones Act applicable to the undisputed facts of this case. The plaintiff does not meet both prongs of the test to be a seaman, and the Jones Act does not apply to her. Hence, the Defendant's Motion for Summary Judgment must be **GRANTED.** Plaintiff's Amended Complaint is **DISMISSED.**

**SO ORDERED.**

**Dated:**   July 14, 2006

_____
WILLIAM G. HUSSMANN, JR.
Magistrate Judge

**Electronic copies to:**

Wilmer E. Goering II
ECKERT ALCORN GOERING & SAGE
goering@eaglaw.com

William Edward Jenner
JENNER AUXIER & JACOBS LLP
wjenner@jennerauxierjacobs.com

Heidi Kendall-Sage
ECKERT ALCORN GOERING & SAGE
sage@eaglaw.com